# Third District Court of Appeal

## State of Florida

Opinion filed May 8, 2024.
Not final until disposition of timely filed motion for rehearing.

_____

No. 3D23-0071
Lower Tribunal No. 21-2908
_____


**CG Tides LLC, et al.,**
Appellants,

vs.

**SHEDDF3 VNB, LLC,**
Appellee.


An appeal from the Circuit Court for Miami-Dade County, Pedro P. Echarte, Jr., Judge.

Young, Berman, Karpf & Karpf, P.A., and Andrew S. Berman; Richard and Richard, P.A., and Dennis Richard and Kevin R. Shohat, for appellants.

Lynx Law PLLC, and Christopher B. Spuches; Agentis PLLC, and Christopher B. Spuches and Tamara Van Heel; Law Offices of Paul Morris, P.A., and Paul Morris, for appellee.


Before LOGUE, C.J., and LINDSEY and LOBREE, JJ.

LOGUE, C.J.

CG Tides LLC, et al. (the "Borrowers") appeal a final summary judgment of foreclosure. Among other things, the judgment at issue allows over $20,000,000 in retroactively calculated default interest on a loan with a principal balance of $41,793,694. The retroactive default interest is based on the finding that the Borrowers' use of hurricane insurance proceeds to repair hurricane damage to the mortgaged property violated the Note and therefore constituted a default. Because an issue of fact exists regarding whether the lender agreed to the use of the proceeds for this purpose, we reverse.

## BACKGROUND

This foreclosure case involves three main actors. The first is the Appellants, CG Tides LLC, et al., which are the mortgagors that borrowed the money and granted the Mortgage at issue. The second is the original lender, Ocean Bank. The third is the Appellee, SHEDDF3 VNB, LLC (the "Note Holder"), which purchased the Note from Ocean Bank and brought the foreclosure action.

We are reviewing the grant of a motion for summary judgment. So, we begin with the undisputed facts. In October 2014, the Borrowers obtained a $45,000,000 loan from Ocean Bank and granted a mortgage in the Tides Hotel on Miami Beach. To simplify greatly, the Note provided for the payment of interest only during the term of the loan and the payment of the entire

2

principal on a set date, unless the parties exercised an option to convert the loan to a more traditional 25-year loan. The Borrowers were required to fund an escrow account at Ocean Bank to ensure payment of the interest. The parties extended the due date for payment of the principal several times.

In September 2017, the Hotel was seriously damaged by Hurricane Irma and was closed for over a year. The Mortgage authorized Ocean Bank to direct the Hotel's insurance company to pay any insurance proceeds directly to Ocean Bank and provided that Ocean Bank could sign any draft as the Borrowers' attorney. However, under the Note and Mortgage, Ocean Bank had the "sole but reasonable discretion not to use the proceeds to repair," except in certain, limited circumstances when the proceeds had to be used to repair the Hotel. The Borrowers, on the other hand, were obliged to repair the Hotel even if the proceeds were not available for that purpose.

Within a few weeks of the hurricane, representatives from the Borrowers and Ocean Bank met at the Hotel, inspected the hurricane damage, and discussed the Borrowers' insurance claim. Despite the Mortgage's terms, and although aware of the insurance claim, Ocean Bank never exercised the option to have the insurance proceeds sent directly to it. In November 2017, the Borrowers received $2,000,000 in insurance

3

proceeds. The Borrowers spent at least $7,728,367 to repair and renovate the Hotel after the hurricane.

At this point, the parties' summary judgment materials presented two alternative views of the facts. The Note Holder contended that there was no record evidence that the funds spent by the Borrowers to repair the Hotel after the hurricane included the insurance proceeds. It also denied that Ocean Bank knew of or approved the Borrowers' use of the insurance proceeds to repair the Hotel, contending Ocean Bank did not learn of this until after it sold the Note to the Note Holder. Among other things, the Note Holder relied on the affidavit of an Ocean Bank vice president so testifying and on Ocean Bank emails inquiring about the insurance proceeds. In argument, the Note Holder maintained the Borrowers' use of the insurance proceeds was done "secretly" and rose to the level of "felony grand theft."

On the other hand, the Borrowers maintained the opposite. In an affidavit of one of their principals, they asserted that the $7,728,367 they spent after the hurricane included the hurricane proceeds and that Ocean Bank's loan officer verbally agreed to use the insurance proceeds to repair and renovate the Hotel. The Borrowers also presented documents showing that they sent Ocean Bank a tax return that included a reference to receipt of the insurance proceeds. Finally, they pointed to Ocean Bank's loan file

4

which contained a February 22, 2018 entry stating "the Tides Hotel property was damaged in the hurricane and has been closed since[,] . . . the Borrower[s] expect[ ] to use the insurance proceeds to perform the renovations and expansion of the Tides Hotel." Ocean Bank stamped this entry "approved." A related memorandum in the file regarding construction at the Hotel also stated the Borrowers intended to use the insurance proceeds "to perform renovations" in light of "damage during Hurricane Irma."

Subsequently, around March 2020, shortly after the due date expired, the Borrowers and Ocean Bank agreed to modifications of parts of the Note and related agreements. According to the Borrowers' materials, modifications were agreed such that (1) the final due date was extended to December 20, 2020; (2) the Borrower pre-paid all interest on the loan through the due date; and (3) Ocean Bank waived default interest[1] and indicated that it was unaware of any other defaults.

In October 2020, as the due date approached, the parties made further modifications that allowed Ocean Bank to use certain of the Borrowers' funds escrowed with Ocean Bank to pay down the principal to $41,793,694. Among other things, this modification recognized that the parties anticipated that the

---

[1] Exactly what default interest was waived is disputed.

"Borrower[s] will make arrangements to refinance the [l]oan with another Lender . . . ."

The due date of December 20, 2020 came but the Borrowers failed to pay the principal (the interest had already been paid to that date). The Borrowers then arranged to refinance the now-defaulted loan. They signed a detailed term sheet and deposited $100,000 with a new lender for a loan of $52,000,000 to close in the second week of February 2021, subject to receiving a payoff letter from Ocean Bank.

Shortly afterwards, on January 26, 2021, Ocean Bank sold the loan to the Note Holder. The Note was sold at par for the principal owed, $41,793,694. According to the managing director of the Note Holder, its business model is to acquire pre-existing, non-performing loans so that it can "mine the loan histories" to "exploit" opportunities to obtain "retroactive default interest."

When asked to provide the payoff letter for the new financing, the Note Holder wrote that "it ha[d] just come to [it]'s attention" that the Borrowers had obtained insurance proceeds and failed to deliver the proceeds to the Note Holder's predecessor, Ocean Bank, as required by the Note and Mortgage. That being so, the Note Holder demanded interest at the default interest rate of 18%, not as of the defaulted payoff date of December 20, 2020, but

retroactively to September 30, 2017 (the date the Borrowers allegedly failed to turn over the insurance proceeds). It did this even though the interest for the period had already been paid, albeit at the non-default rate. Based on this demand, although the principal owed was $41,793,694, the payoff letter demanded $26,442,454 in retroactive default interest from September 9, 2017 to February 2, 2021, resulting in a new amount owed of $61,058,454. The Note Holder's payoff letter thereby effectively ended the planned $52,000,000 refinancing.

Ultimately, the Note Holder filed the underlying foreclose action. The Borrowers counterclaimed for breach of contract and various other remedies. The Note Holder moved for summary judgment. The trial court granted the Note Holder's motion for summary judgment. It entered a total foreclosure judgment of $82,169,522, which included principal of $41,793,694, miscellaneous costs, and pre-judgment default interest of $40,167,725. This appeal followed.

## DISCUSSION

The Borrowers raise several arguments in this appeal. We address one. The Borrowers argue that summary judgment was precluded by an issue of fact—whether the Borrowers' use of the insurance proceeds to

repair the hurricane damage breached the loan contract and triggered a default.

Properly understood, summary judgment is akin to a pre-trial directed verdict. In re Amends. to Fla. R. of Civ. Proc. 1.510, 317 So. 3d 72, 75 (Fla. 2021) (recognizing "the fundamental similarity between the summary judgment standard and the directed verdict standard"). Summary judgment is not designed to resolve disputed issues of fact. It merely serves to identify whether an issue of fact exists that must be resolved by trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986) ("The inquiry performed is the threshold inquiry of determining whether there is the need for a trial— whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.").

The evidence in the summary judgment record is interpreted in the light most favorable to the non-moving party. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) ("[O]n summary judgment the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." (citations and quotation marks omitted)). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury

functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict." Anderson, 477 U.S. at 255.

Summary judgment "by no means authorizes trial on affidavits." Id. Once a court determines the summary judgment record contains conflicting evidence on a material issue of fact from which a factfinder could reach different conclusions by crediting some evidence over other evidence, the court does not resolve the factual dispute. Id. It simply denies summary judgment and allows the case to proceed to trial. Id.

With this law in mind, we turn to a review of the summary judgment record in this case on the issue of whether Ocean Bank knew and approved of the Borrowers' use of the insurance proceeds to repair the hurricane damage to the Hotel. On one hand, a vice president of Ocean Bank denied this fact under oath. On the other hand, when interpreted in a light most favorable to the non-moving party, other evidence in the summary judgment indicates that Ocean Bank knew of the hurricane damage, knew of the insurance claim, did not exercise its right under the Mortgage to direct the insurance company to pay the proceeds solely to itself, received a copy of the Borrowers' tax return reflecting receipt of the insurance proceeds at issue, verbally approved the use of the proceeds for repair and renovation, and approved this use in writing in its own internal records.

Moreover, under the Note and Mortgage, any denial by Ocean Bank of the use of the proceeds for repair had to be reasonable. The Hotel was Ocean Bank's collateral for the loan; the loan was for over twenty times the value of the insurance proceeds; and the repairs allowed the Hotel to reopen. The parties also continued to cooperate and make modifications to the loan that were beneficial to both parties.

The point is not that any of these "facts" have been finally established as "true." The point is that the evidence and inferences therefrom conflict. A factfinder could reach different results depending on what evidence it credited and what reasonable inferences it draws from the evidence credited. Given the state of the record, summary judgment should not have been entered on this issue. Accordingly, we reverse the entry of summary judgment in its entirety and remand for further proceedings consistent with this opinion.

Reversed and remanded.